UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

EDWARD NORTRUP,

                Plaintiff,

      v.

KIA CORPORATION AND
KIA AMERICA, INC.

                Defendants.

Case No.:    4:26-cv-543

**JURY TRIAL DEMANDED**

## COMPLAINT FOR PATENT INFRINGEMENT

1.  Edward Nortrup ("Nortrup") hereby brings this action alleging that Defendants Kia Corporation and Kia America, Inc. (collectively, "Kia") have infringed United States Patent Nos. 11,307,048 (the "'048 Patent") and 11,874,131 (the "'131 Patent") (collectively, the "Asserted Patents") in violation of the patent laws of the United States of America, 35 U.S.C. § 1 et seq.

### INTRODUCTION

### Edward Nortrup

2.  Edward Nortrup is a prolific inventor having received a total of 93 issued patents in multiple industries over the course of his career.  His engineering journey began in 1987 at Sylvania, where he led the development of miniaturized high-intensity discharge (HID) lighting systems.  His pioneering work in this field resulted in 34 issued patents, reflecting significant advancements in compact yet powerful lighting technologies.

3.  Building on his expertise in both technology and intellectual property, Nortrup joined Color Kinetics as a Patent Manager.  While overseeing patent strategy, he remained

actively engaged in innovation, contributing to two issued patents that further advanced the company's lighting technologies.

4.      Nortrup left Color Kinetics to focus on a navigation technology, leveraging insights into traffic patterns.  His innovative developments in this space were recognized through 18 issued patents, further underscoring his ability to transform complex problems into practical, real-world applications.

5.      Throughout his career, Nortrup has continued to drive technological advancements, with his inventions spanning lighting, navigation, augmented reality, and other cutting-edge fields.  His extensive patent portfolio is a testament to his relentless pursuit of technological progress and his unwavering commitment to innovation.

## Inventions of the Asserted Patents

6.      Prior to the earliest priority date of the Asserted Patents in 2004, there were essentially two schools of thought on how to implement motor vehicle navigation systems that utilize real-time traffic data: (1) built-in systems and (2) cell phone-based systems.  Built-in systems relied on cellular connectivity specific to an in-vehicle navigation system to report location data and receive traffic pattern data.  Benefits of this approach potentially included a robust GPS location system with large external GPS antenna, a driver-friendly interface (e.g., a display integrated in the dashboard, use of the vehicle's audio system for voice commands), and integration with other vehicle data such as alarms and engine data.  This approach also had the potential benefit that location data sent from the in-vehicle navigation system to a navigation service provider would require no post-acquisition filtering to determine its relevance to traffic patterns; all data sent from built-in systems to navigation service providers would be known to come from a traveling vehicle rather than from a pedestrian standing or walking near a roadway.

2

7.      Nortrup recognized that built-in systems also had certain challenges, however. For example, he appreciated that the in-vehicle hardware of built-in systems would be difficult and expensive to upgrade as navigation technology rapidly improved.  He also predicted that many motorists would not be interested in purchasing a dedicated cellular plan for their vehicle's navigation system.  Finally, because built-in navigation systems were likely to be uncommon for the foreseeable future, the traffic data generated by networks of such systems was unlikely to be robust, and thus traffic reporting would be unreliable.

8.      The cell phone approach relied on portable cellular devices for navigation and reporting of location data.  Nortrup recognized that the cell phone approach had certain advantages over the built-in approach.  For example, because individuals were upgrading their cell phones much more rapidly than their cars and trucks, a real-time navigation architecture built on mobile devices would be more flexible and upgradable.  Moreover, because cell phones were likely to be more ubiquitous than vehicles with advanced navigation features, the location data reported to navigation service providers would be more robust.

9.      Nortrup also perceived certain disadvantages with the cell phone approach. Although the data reported from the devices would be more extensive, navigation service providers would have no definitive way of knowing whether a device reporting its location was inside a vehicle stuck in traffic (i.e., relevant to navigation) or rather on a pedestrian (irrelevant). Nortrup also appreciated that the cell phone approach would deprive motorists of the driver-friendly and safer user interface, enlarged GPS antennae, etc. of the built-in approach.

10.      The claimed inventions of the Asserted Patents brought the advantages of the built-in and cell phone approaches together while mitigating or eliminating their respective disadvantages.  The Asserted Patents teach, for example, a vehicle with a built-in display

3

consistent with the built-in approach, and which may include other features as well, but rather than perform the core navigation functions itself it relies on a connected cell phone for these functions.  The cell phone determines the location of the phone or vehicle, receives traffic data, and transmits the relevant data to the vehicle for presentation of a map and route on the display.  Crowd-sourced cell phone location data relevant to traffic can be isolated by considering the cell phones' proximities to roadways and/or speed.

11.    The claimed inventions improve the features and functionality of the vehicle, the cell phone, and the navigation network that processes traffic data into route recommendations.  The vehicle is improved at least because it can present traffic-responsive navigation information through its built-in display without requiring the expensive hardware of built-in navigation systems.  Further, the vehicle is improved by vastly augmenting the upgradability of its navigation system.  The cell phone is improved at least by allowing its navigation applications to be presented on a safer and more driver-friendly display and potentially integrate with other features and hardware of the vehicle.  And finally, the navigation network is improved by using ubiquitous cell phone location and movement data that is attributed to vehicle movement to provide robust crowd-sourced traffic data.

**Apple CarPlay and Android Auto**

12.    Over ten years after the earliest priority date of the Asserted Patents in 2014-2015, Apple and Google announced the release of CarPlay and Android Auto, respectively.  These systems are fundamentally similar, both allowing a cell phone to connect with a vehicle's infotainment system to expand and reformat the phone's user interface to the vehicle's screen(s), buttons, etc.  Whereas Apple CarPlay allows iPhone devices to connect to the infotainment system, Android Auto allows Android devices to connect.

4



(Depiction of Infotainment System Displaying Apple CarPlay Interface)



(Depiction of Infotainment System Displaying Android Auto Interface)

13.    Apple CarPlay and Android Auto have been massively successful and are important drivers of consumer demand for new vehicles.  In 2022, Apple reported that 98% of new cars in the U.S. come with CarPlay installed and that 79% of U.S. buyers would only buy a

car if it supported CarPlay.  (Kif Leswing, *Apple's New Car Software Could Be a Trojan Horse into the Automotive Industry*, CNBC (Jul. 22, 2022), *available at* https://www.cnbc.com/2022/07/22/apple-carplay-could-be-a-trojan-horse-into-the-automotive-industry.html.)  "It's a must-have feature when shopping for a new vehicle," an Apple engineering manager stated during a presentation of new CarPlay features.  (*Id.*)  Indeed, a 2018 study showed that "[w]hen users have both CarPlay and a built-in system, they tend to use CarPlay."  (Kif Leswing, *Apple's Massive Success with CarPlay Paves the Way for Automotive Ambitions*, CNBC (May 29, 2021), *available at* https://www.cnbc.com/2021/05/29/apple-carplay-massive-success-paves-way-for-automotive-entry.html.)  Android Auto adoption and demand have followed a similar trajectory.  (*See* Bill Froberg, *Android Auto and Apple CarPlay Remain Standard Fixtures in MY '23*, WARDS INTELLIGENCE (Nov. 28, 2023), *available at* https://wardsintelligence.informa.com/wi967531/android-auto-and-apple-carplay-remain-standard-fixtures-in-my-23.)

### Kia's Sales of Vehicles with Apple CarPlay and Android Auto

14.    On information and belief, Kia started including Apple CarPlay and Android Auto in select new Kia vehicles in 2014.  (*See More than 800 Models to Choose From*, APPLE, https://www.apple.com/ios/carplay/available-models; *Find Your Ride with Android Auto*, ANDROID, https://www.android.com/auto/compatibility/vehicles/.)  The number of models with Apple CarPlay and Android Auto increased over time, and today many Kia vehicles include at least one of these features as a standard feature or an available option.  (*See id.*)

15.    Not only did Kia sell new vehicles with Apple CarPlay and/or Android Auto, it also operated its Kia Certified Pre-Owned program with a network of regional dealerships and retailers to sell used/preowned vehicles having Apple CarPlay and/or Android Auto.  (*See*

6

*Discover Kia Certified Pre-Owned*, KIA, https://www.kia.com/us/en/cpo.)  For example, Kia provided websites for potential customers to locate available used inventory at local dealerships and retailers, provided warranty services, provided financial services, and provided marketing/advertising to assist and induce Kia dealerships/retailers to sell used vehicles having Apple CarPlay and/or Android Auto.  (*Id.*)

16.    Collectively, these Kia vehicles with Apple CarPlay and/or Android Auto, which were made, used, sold, offered for sale, and/or imported during the life of one or more of the Asserted Patents—whether those vehicles were new or used/preowned—are referred to herein as the "Accused Vehicles."  The Accused Vehicles include, without limitation, at least the following models:  Cadenza, Carnival, EV6, EV9, Forte, K4, K5, K900, Niro, Optima, Rio, Sedona, Seltos, Sorento, Soul, Sportage, Stinger, and Telluride, together with the hybrid, plug-in hybrid, electric, GT, GT-Line, performance, and other variants of those model lines sold, offered for sale, leased, used, and/or imported in the United States.

17.    During the life of the Asserted Patents, Kia made, used, sold, offered for sale, and/or imported the Accused Vehicles throughout the United States, including in this District. Kia also induced its network of Kia dealerships/retailers to sell, lease, and offer to sell both new and used Accused Vehicles throughout the United States, including in this District.  Kia also induced end-users to use the Accused Vehicles throughout the United States, including in this District.

## THE PARTIES

18.    Edward Nortrup is an individual residing in Stoneham, Massachusetts.

19.    Kia Corporation is a corporation organized and existing under the laws of the Republic of Korea with a principal place of business at 12 Heolleung-ro, Seocho-gu, Seoul 06797, South Korea.

20.     Kia America, Inc. is a corporation organized and existing under the laws of California with a principal place of business at 111 Peters Canyon Road, Irvine, California 92606.  On information and belief, Kia America maintains a regular and established place of business in this District, including at 5810 Tennyson Pkwy, Plano, TX 75024.

## JURISDICTION AND VENUE

21.     This is a civil action for patent infringement arising under the patent laws of the United States as set forth in 35 U.S.C. §§ 271, *et seq*.

22.     This Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

23.     This Court has personal jurisdiction over Kia America at least because, on information and belief, Kia America maintains a regular and established place of business in this District (at least at 5810 Tennyson Pkwy, Plano, TX 75024) and has committed acts of patent infringement in this District.  Kia America makes, imports, markets, distributes, offers for sale, and/or sells Kia-branded automotive vehicles and components in the United States, including in this District.

24.     This Court has personal jurisdiction over Kia Corporation at least because, on information and belief, Kia Corporation purposefully directs and controls the manufacture, importation, distribution, marketing, and sale of Kia-branded automotive vehicles and components in the United States, including in this District, and has committed acts of patent infringement in this District.

25.     Venue is proper in this District as to Kia America pursuant to 28 U.S.C. § 1400(b) because Kia America has a regular and established place of business in this District and has committed acts of infringement within this District.  Venue is also proper as to Kia Corporation

8

pursuant to 28 U.S.C. § 1391(c)(3) because it is not a resident of the United States and may be sued in any judicial district.

## THE ASSERTED PATENTS

26.     The '048 Patent, which is entitled "Method and System for Providing Travel Time Information," was duly and legally issued to inventor Edward Nortrup on April 19, 2022. A true copy of the '048 Patent is attached hereto as **Exhibit A**.

27.     Nortrup is the owner of the entire right, title, and interest in and to the '048 Patent, which is presumed valid under 35 U.S.C. § 282.

28.     The '131 Patent, which is entitled "Method and System for Providing Travel Time Information," was duly and legally issued to inventor Edward Nortrup on January 16, 2024.  A true copy of the '131 Patent is attached hereto as **Exhibit B**.

29.     Nortrup is the owner of the entire right, title, and interest in and to the '131 Patent, which is presumed valid under 35 U.S.C. § 282.

## COUNT I:  DIRECT INFRINGEMENT OF THE '048 PATENT

30.     Nortrup incorporates by reference each of the above paragraphs as if fully restated herein.

31.     During the life of the '048 Patent, Kia directly infringed under 35 U.S.C. § 271(a), either literally or under the doctrine of equivalents, one or more claims of the '048 Patent by making, using, selling, offering to sell, and/or importing the Accused Vehicles within the United States.

32.     A detailed infringement analysis demonstrating how the Accused Vehicles practice each and every limitation of claim 1 of the '048 Patent, either literally or under the doctrine of equivalents, is provided in **Exhibits C and D**.

33.     Kia's direct infringement of the '048 Patent was also willful, as Nortrup informed Kia of its infringement on March 25, 2024 (*see* **Exhibit G**), and Kia continued to infringe thereafter.

34.     As a result of Kia's direct infringement of the '048 Patent, Nortrup has suffered monetary damages.

### COUNT II:  INDIRECT INFRINGEMENT OF THE '048 PATENT

35.     Nortrup incorporates by reference each of the above paragraphs as if fully restated herein.

36.     During the life of the '048 Patent, Kia actively induced infringement of the '048 Patent by its regional Kia dealerships/retailers across the country.  Each of these dealerships/retailers directly infringed by selling, offering to sell, leasing, and/or using new and used Accused Vehicles, and Kia actively induced this infringement in a variety of ways, for example by supplying new Accused Vehicles to the dealerships and retailers to be sold or leased, offering its Kia Certified Pre-Owned program to certify used vehicles for sale, providing training and technical support to regional sales teams, and providing marketing and advertising services.

37.     Kia further actively induced infringement of the '048 Patent by its customers that purchased, leased, and/or used the Accused Vehicles under 35 U.S.C. § 271(b). (*See* **Exhibits C, D**.)  By using Apple CarPlay or Android Auto in the Accused Vehicles in connection with a navigation app such as Apple Maps, Google Maps, or Waze, Kia's customers put the invention into service, i.e., controlled the system as a whole and obtained benefit from it.  Indeed, by navigating using Apple CarPlay or Android Auto in the Accused Vehicles, Kia's customers benefited from each claimed component of the invention, for example because each claimed component contributed to augmenting the user's driving and navigating experience, providing a

prominent and convenient user interface and helpful routing based on real-time traffic conditions.

*38.*    Kia's sale, support, instruction, and promotion of the Accused Vehicles to customers and prospective customers, especially with respect to the Apple CarPlay and Android Auto features of these Accused Vehicles, constituted active encouragement and instruction to infringe the '048 Patent.  For example, Kia published support materials instructing customers how to connect and use Apple CarPlay and Android Auto, including for app-based navigation. (*See, e.g.*, *CarPlay | The Kia K4*, KIA WORLDWIDE, https://www.youtube.com/watch?v=wAWowJ3IGaM (instructing how to use both CarPlay and Android Auto).)  Kia also updated its software in the Accused Vehicles to continue support for Apple CarPlay and Android Auto.

39.    Kia had knowledge of the '048 Patent, of its infringement of the '048 Patent, of its dealerships'/retailers' infringement of the '048 Patent, and of its customers' infringement of the '048 Patent at least as of March 25, 2024, when Nortrup sent it (and it received) a patent infringement notice letter explicitly accusing it of infringement.  (*See* **Exhibit G**.)

40.    Kia's indirect infringement of the '048 Patent was also willful, as Nortrup informed Kia of its infringement on March 25, 2024 (*see* **Exhibit G**), and Kia continued to infringe thereafter.

41.    Upon information and belief, Kia had many dealerships/retailers and end user customers who directly infringed the '048 Patent.  As a result of Kia's infringement and its dealerships'/retailers' and customers' infringement of the '048 Patent, Nortrup has suffered monetary damages and seeks recovery in an amount adequate to compensate Nortrup for Kia's infringement.

## COUNT III:  DIRECT INFRINGEMENT OF THE '131 PATENT

42.    Nortrup incorporates by reference each of the above paragraphs as if fully restated herein.

43.    During the life of the '131 Patent, Kia directly infringed under 35 U.S.C. § 271(a), either literally or under the doctrine of equivalents, one or more claims of the '131 Patent by making, using, selling, offering to sell, and/or importing the Accused Vehicles within the United States.

44.    A detailed infringement analysis demonstrating how the Accused Vehicles practice each and every limitation of claim 1 of the '131 Patent, either literally or under the doctrine of equivalents, is provided in **Exhibits E and F**.

45.    Kia's direct infringement of the '131 Patent was also willful, as Nortrup informed Kia of its infringement on March 25, 2024 (*see* **Exhibit G**), and Kia continued to infringe thereafter.

46.    As a result of Kia's direct infringement of the '131 Patent, Nortrup has suffered monetary damages.

## COUNT IV:  INDIRECT INFRINGEMENT OF THE '131 PATENT

47.    Nortrup incorporates by reference each of the above paragraphs as if fully restated herein.

48.    During the life of the '131 Patent, Kia actively induced infringement of the '131 Patent by its regional Kia dealerships/retailers across the country.  Each of these dealerships/retailers directly infringed by selling, offering to sell, leasing, and/or using new and used Accused Vehicles, and Kia actively induced this infringement in a variety of ways, for example by supplying new Accused Vehicles to the dealerships and retailers to be sold or leased,

12

offering its Kia Certified Pre-Owned program to certify used vehicles for sale, providing training and technical support to regional sales teams, and providing marketing and advertising services.

49.     Kia further actively induced infringement of the '131 Patent by its customers that purchased, leased, and/or used the Accused Vehicles under 35 U.S.C. § 271(b).  (*See* **Exhibits E, F**.)  By using Apple CarPlay or Android Auto in the Accused Vehicles in connection with a navigation app such as Apple Maps, Google Maps, or Waze, Kia's customers put the invention into service, i.e., controlled the system as a whole and obtained benefit from it.  Indeed, by navigating using Apple CarPlay or Android Auto in the Accused Vehicles, Kia's customers benefited from each claimed component of the invention, for example because each claimed component contributed to augmenting the user's driving and navigating experience, providing a prominent and convenient user interface and helpful routing based on real-time traffic conditions.

50.     Kia's sale, support, instruction, and promotion of the Accused Vehicles to customers and prospective customers, especially with respect to the Apple CarPlay and Android Auto features of these Accused Vehicles, constituted active encouragement and instruction to infringe the '131 Patent.  For example, Kia published support materials instructing customers how to connect and use Apple CarPlay and Android Auto, including for app-based navigation. (*See, e.g.*, *CarPlay | The Kia K4*, KIA WORLDWIDE, https://www.youtube.com/watch?v=wAWowJ3IGaM (instructing how to use both CarPlay and Android Auto).)  Kia also updated its software in the Accused Vehicles to continue support for Apple CarPlay and Android Auto.

51.     Kia had knowledge of the '131 Patent, of its infringement of the '131 Patent, of its dealerships'/retailers' infringement of the '131 Patent, and of its customers' infringement of

the '131 Patent at least as of March 25, 2024, when Nortrup sent it (and it received) a patent infringement notice letter explicitly accusing it of infringement.  (*See* **Exhibit G**.)

52.    Kia's indirect infringement of the '131 Patent was also willful, as Nortrup informed Kia of its infringement on March 25, 2024 (*see* **Exhibit G**), and Kia continued to infringe thereafter.

53.    Upon information and belief, Kia had many dealerships/retailers and end user customers who directly infringed the '131 Patent.  As a result of Kia's infringement and its dealerships'/retailers' and customers' infringement of the '131 Patent, Nortrup has suffered monetary damages and seeks recovery in an amount adequate to compensate Nortrup for Kia's infringement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Nortrup respectfully requests the following relief:

A.    A judgment in favor of Nortrup that Kia infringed, either literally and/or under the doctrine of equivalents, both directly and indirectly, each of the Asserted Patents;

B.    A finding that Kia's infringement was willful;

C.    An award of damages resulting from Kia's acts of infringement in accordance with 35 U.S.C. § 284;

D.    An accounting of damages incurred by Nortrup for Kia's acts of infringement occurring during the life of the Asserted Patents;

E.    Pre- and post-judgment interest on such damages to Nortrup;

F.    A judgment and order finding that this is an exceptional case within the meaning of 35 U.S.C. § 285 and awarding to Nortrup reasonable attorneys' fees against Kia;

G.    Any and all other relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Nortrup respectfully requests a trial by jury on all issues triable thereby.

DATED this 21st day of May, 2026.

RESPECTFULLY SUBMITTED,

By:      */s/ David K. Ludwig*
           David K. Ludwig
           Georgia Bar No. 616971
           Steven G. Hill
           Georgia Bar No. 354658
           Hill, Kertscher & Wharton, LLP
           3625 Cumberland Blvd., SE
           Suite 1050
           Atlanta, Georgia 30339-6406
           Tel.: (770) 953-0995
           Email: dludwig@hkw-law.com
           Email: sgh@hkw-law.com

           *Counsel for Plaintiff Edward Nortrup*